1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11  PATRICIA MORENO,                                  ) Case No.: 1:20-cv-01503-SKO
                                                       )
12                      Plaintiff,                     ) ORDER REGARDING PLAINTIFF'S SOCIAL
                                                       ) SECURITY COMPLAINT
13          v.                                         )
                                                       ) ORDER DIRECTING ENTRY OF JUDGMENT IN
14  KILOLO KIJAKAZI,[1] Acting Commissioner )           FAVOR OF DEFENDANT KILOLO KIJAKAZI
    of Social Security,                                ) AND AGAINST PLAINTIFF
15                                                     )
                        Defendant.                     )
16  _____          )

17  **I.      INTRODUCTION**

18          On October 22, 2020, Plaintiff Patricia Moreno ("Plaintiff") filed a complaint under 42 U.S.C.

19  § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the

20  "Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB")

21  under Title II of the Social Security Act (the "Act").  (Doc. 1.)   The matter is currently before the

22  Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.

23  Oberto, United States Magistrate Judge.[2]

24  /////

25  /////

26

27  _____

28  [1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of
    the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted as Defendant in this suit.
    [2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 10.)

## II.     BACKGROUND

On September 12, 2018, Plaintiff filed an application for DIB under Title II of the Act, alleging she became disabled on June 1, 2013.  (Administrative Record ("AR") 64, 171.)  She alleges she became disabled due to a combination of physical and mental impairments, including wrist ligament damage, steel plates in right femur, double vision, osteoarthritis in the right knee, chronic headaches, left hand blood backup, and anxiety while driving.  (AR 64.)  Plaintiff was born on July 23, 1963, and was 49 years old as of the alleged onset date. (AR 63.)  Plaintiff completed high school and attended college for a year, and she worked as a food service manager from 2003 to 2013.  (AR 34, 73.)

### A.     Relevant Medical Evidence[3]

#### 1.     Prior Administrative Medical Findings ("PAMF")[4]

On December 6, 2018, state agency consultant R. Masters, M.D., reviewed Plaintiff's medical history at the initial consideration level.  (AR 63-75.)  Dr. Masters determined that Plaintiff had severe impairments of major joint dysfunction and migraine headaches.  (AR 69-70.)  Dr. Masters found that Plaintiff's allegations of disability are documented but the listing level of severity of impairment was not supported by the treatment history or objective findings. (AR 71.)  Dr. Masters determined that Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand, sit and/or walk about 6 hours in an 8-hour workday, and had no restrictions on pushing and pulling.  (AR 71.)  He further found that Plaintiff could: occasionally climb ramps/stairs, stoop, kneel, crouch and crawl; frequently balance; but never climb ropes, ladders or scaffolds. (AR 72.)  Dr. Masters opined that Plaintiff had no restrictions for reaching and feeling, no visual limitations, no communicative limitations, and no environmental limitations. (AR 72-73.)  However, Dr. Masters opined that Plaintiff had limitations to her right hand and was restricted to frequent manipulation of the hand. (AR 72-73.)

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

[4] According to the revised regulations, for claims filed on or after March 27, 2017, the terms "prior administrative medical finding" or "PAMF" refer to the findings made by state agency medical and psychological consultants who review claims at the initial and reconsideration levels. See 20 C.F.R. § 404.1513(a)(5).

On February 12, 2019, state agency consultant A. Wong, M.D., reviewed the medical records at the reconsideration level. (AR 77-90.)  D. Wong agreed with Dr. Masters' findings. (AR 86-88.)

2.      Medical Provider Opinions – Right Wrist and Thumb

On January 28, 2013, while working as a food service manager with Lammersville Unified School District, Plaintiff sustained a right thumb, hand and wrist injury as she was lifting a 30-pound box of frozen chicken.  (AR 362-88, 390-410, 751.) Plaintiff stated she heard a snap and pop in her thumb as it was pushed back. (AR 751.)  Plaintiff was sent to treatment with Dr. Patel for the injury the next day, and was initially diagnosed with metacarpal strain. (AR 751.)  A nerve conduction study revealed normal findings, and an x-ray of the hand showed edema but otherwise did not show any particular fractures. (AR 751.)

On October 13, 2014, Carl Fieser, M.D., submitted a report as a Panel Qualified Medical Evaluator in connection with Plaintiff's right thumb injury. (AR 362-88, 390-410.) Dr. Feiser reviewed Plaintiff's medical records and noted that Plaintiff had been diagnosed with a right thumb sprain.  (AR 375.)  X-rays of the right hand were normal. (AR 375.)  Plaintiff received a steroid injection to her right hand which provided some benefit. (AR 375.)  Plaintiff continued to complain of pain to her right hand and was diagnosed by Dr. Jerome Robson with right CMC strain with possible ligamentous damage. (AR 376, 754.)  On August 8, 2013, Plaintiff underwent an MR arthrogram of the right wrist which revealed evidence of triangular fibrocartilage complex (TFCC) tear. (AR 376.) A repeat of the study was performed on September 11, 2013, with the same results. (AR 376.) Gabapentin was added to her medication regimen, and she was placed on modified duty, with restrictions of no lifting more than 5 pounds and no repetitive motion of the hand including grasping, fine manipulation, pushing, pulling, and rotation of wrist and thumb. (AR 376.)  Plaintiff continued to treat with Dr. Robson through 2014, and she was prescribed naproxen, gabapentin, and tramadol.  (AR 376.)

On November 19, 2013, Petitioner presented to Dr. Robson for reevaluation of her right thumb injury. (AR 766.)  Her pain levels remained the same, and she was prescribed gabapentin, naproxen and tramadol. (AR 767.)  Dr. Robson referred Plaintiff to Dr. Caviale, a hand surgeon, for evaluation. (AR 767.)

On December 23, 2013, Plaintiff presented to Dr. Caviale for evaluation of her right thumb injury. (AR 763.) X-rays revealed no fractures, dislocations, bone or soft tissue lesions. (AR 765.) Dr. Caviale noted the report of the August 8, 2013, MR angiogram which indicated a tear of the triangular fibrocartilage complex. (AR 765.) Dr. Caviale recommended a diagnostic/therapeutic injection. (AR 765.)

On February 4, 2014, Dr. Caviale provided an injection into the CMC joint/base of the right thumb with resulting pain relief for a period of four weeks. (AR 376.) She was continued on modified duty with restrictions of no lifting, pushing or pulling more than 10 pounds, and no repetitive motions of the right hand. (AR 376.)

On February 19, 2014, Plaintiff was seen by Dr. Robson for reevaluation. (AR 756.) Plaintiff had swelling of the right metacarpal joints as a result of the injection, and she still had significant right wrist and thumb pain. (AR 757.) Plaintiff was continuing to take gabapentin, naproxen and tramadol. (AR 757.)

On March 18, 2014, Plaintiff presented to Dr. Robson for reevaluation. (AR 751.) Plaintiff was taking gabapentin, naproxen and tramadol. (AR 752.) Objective findings remained unchanged, but Plaintiff was experiencing a decreased range of motion in her wrist. (AR 752.)

On April 14, 2014, Plaintiff was seen by Dr. Robson for reevaluation. (AR 746.) Plaintiff was still taking gabapentin, naproxen and tramadol. (AR 747.) Examination results were essentially the same as March 18, 2014. (AR 749.) Plaintiff had reasonable range of motion in her right thumb but she experienced pain when the thumb was distracted toward her radius. (AR 748.)

On June 4, 2014, Plaintiff returned to Dr. Caviale for follow-up and Dr. Caviale opined that she did not need work restrictions. (AR 376.) On August 18, 2014, a bone scan was completed of her right thumb, with normal findings. (AR 377.)

On October 13, 2014, Dr. Feiser examined Plaintiff's right wrist and opined that Plaintiff had range of motion of 60 degrees dorsiflexion, 65 degrees palmar flexion, 35 degrees radial deviation, and 40 degrees ulnar deviation. (AR 383.) Phalen's test and Tinel's sign were both negative. (AR 383.) She had weakness of grip strength of the right hand and swelling/tenderness over the right forearm and wrist. (AR 387.) Dr. Feiser opined that Plaintiff had not yet reached maximum

improvement. (AR 387-88.)  Dr. Feiser determined that Plaintiff should be precluded from forceful pushing, pulling, twisting, torquing, gripping, grasping, pinching, squeezing, lifting and carrying with her right hand. (AR 388.)

On January 12, 2015, Plaintiff presented to Dr. Robson for reevaluation of her right thumb and wrist injury.  (AR 666-69.)  Plaintiff had reasonable range of motion but still experienced pain on movement. (AR 668.)  Dr. Robson noted that Plaintiff was to have arthroscopic surgery on her thumb the following week. (AR 668.)

In January of 2015, Dr. Paul Caviale performed arthroscopic surgery on Plaintiff's right thumb. (AR 394.)

On February 9, 2015, Plaintiff was seen by Dr. Robson. (AR 660.)  Plaintiff indicated that the pain in her right thumb and wrist had significantly improved. (AR 658.)  Plaintiff was pleased with the surgery. (AR 658.)  She was experiencing post-surgical pain but it was different from the original pain. (AR 658.)  Dr. Robson discontinued all pain medications because of the improvement in pain. (AR 658.)

 On November 24, 2015, Dr. Feiser completed a comprehensive medical-legal re-evaluation. (AR 390.)  Dr. Feiser opined that Plaintiff's right wrist and right thumb condition had reached permanent and stationary status at that point.  (AR 408.)  Plaintiff's right thumb still had reasonable range of motion and full extension and flexion; however, she still had pain toward the radius. (AR 394.) She also still had weakness in her right hand. (AR 394.)  Dr. Feiser indicated that Plaintiff still had pain but was much better than she was over two years ago, that she was ready to get into functional work, that there was no need for medication, and that she had already gone through physical therapy. (AR 394.)  Dr. Feiser opined that Plaintiff's work capacity was limited, but she now had the capacity to lift up to 25 pounds, she was restricted from repetitive motions of the right wrist, and she was to avoid any forceful pushing, pulling, twisting, torquing, gripping, grasping, pinching, sneezing (sic), lifting or carrying, or other activities involving comparable physical effort. (AR 410.)  Dr. Feiser further opined that Plaintiff had no limitations in standing, walking or sitting. (AR 395.)

On August 24, 2015, September 22, 2015, October 27, 2015, November 23, 2015, January 28, 2016, March 8, 2016, April 6, 2016, May 11, 2016, and June 20, 2016, Plaintiff presented to Dr.

Robson for reevaluation of her right wrist and thumb injury.  (AR 544, 550, 555, 560, 565, 592, 597, 602, 607.)  On all these occasions, Dr. Robson indicated that Plaintiff had reached maximum medical improvement. (AR 545. 551, 556, 561, 566, 593, 598, 603, 608.)  Dr. Robson noted Plaintiff was not taking any medication. (AR 545, 551, 556, 561, 566, 593, 598, 603, 608.)  Dr. Robson cleared Plaintiff for work with restrictions that she not lift more than 25 pounds or do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 547, 553, 557, 563, 568, 595, 600, 605.)

On August 9, 2016, Plaintiff presented to Dr. Robson for reevaluation of her right thumb and right wrist injury. (AR 539.)  Plaintiff stated her pain was fairly constant at 4 out of 10. (AR 540.)  Her condition remained unchanged.  (AR 540.)  She was not taking medications.  (AR 542.)  Dr. Robson opined that Plaintiff should not lift more than 25 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 542.)

On September 21, 2016, Plaintiff was seen by Dr. Robson for reevaluation. (AR 534.)  Plaintiff stated her pain stayed at a consistent 4 out of 10, and that she was currently in the middle of acupuncture treatments which was helping moderately. (AR 535.)  Plaintiff was not taking any medications. (AR 535.)  Dr. Robson opined that Plaintiff should not lift more than 25 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 537.)

On November 29, 2016, Plaintiff presented to Dr. Robson for reevaluation of her right thumb and wrist.  (AR 528.)  Plaintiff indicated her pain level remained a constant 4/10. (AR 529.)  She stated acupuncture was extremely valuable for range of motion, but it didn't help with the pain. (AR 529.)  Plaintiff was off all medications. (AR 529.)  Dr. Robson opined that Plaintiff should not lift more than 25 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 531.)

On January 23, 2017, Plaintiff presented to Dr. Robson for reevaluation. (AR 523.)  Plaintiff described her pain as consistently 4/10 and roughly stays the same. (AR 524.)  Plaintiff was not taking any medications. (AR 524.) Dr. Robson opined that Plaintiff should not lift more than 25 pounds and

should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 526.)

On March 20, 2017, Plaintiff was seen by Dr. Robson for reevaluation. (AR 518.)  Plaintiff stated her right thumb and wrist remained in constant pain around 4/10.  (AR 519.)  Plaintiff was not taking medication. (AR 519.)  Dr. Robson opined that Plaintiff should not lift more than 20 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 521.)

On May 15, 2017, Plaintiff presented to Dr. Robson for reevaluation. (AR 514.)  Plaintiff stated her pain was around 3/10 and she was not seeking further therapy. (AR 515.)  Dr. Robson opined that Plaintiff should not lift more than 20 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 517.)

On July 10, 2017, Plaintiff was seen by Dr. Robson for reevaluation. (AR 510.)  Plaintiff indicated her pain remained around 3/10 and she was taking tramadol to manage the pain. (AR 511.)  Plaintiff indicated she would like to get back to work but did not think she could do her old job. (AR 513.)  Dr. Robson opined that Plaintiff should not lift more than 20 pounds and should not do any repetitive motions with her right wrist including rotation, grasping, pushing, or pulling. (AR 513.)

On December 14, 2017, Plaintiff presented to Annu Navani, M.D., for evaluation of her right hand injury. (AR 460.)  Dr. Navani noted Plaintiff had undergone physical therapy sessions, acupuncture, and a TENS unit. (AR 460.)  Plaintiff described her pain as 4/10, sharp-shooting, numb, and tight. (AR 460.)  She stated the pain was increased with usage, alleviated by rest, and impairs her ability to perform chores, work, and drive. (AR 460.)

On March 14, 2018, Plaintiff presented to Corey Tremblay, PA-C for follow-up of her right hand injury. (AR 428.)  Plaintiff continued to have pain in her right hand. (AR 428.) She stated her symptoms remained unchanged. (AR 428.)  She described the pain as shooting, numbing, and tight, and caused her to drop things sometimes. (AR 428.)

Plaintiff followed up with PA Tremblay on May 4, 2018, June 12, 2018, and September 10, 2018. (AR 428.) Her pain during those intervals ranged from 1/10 to 4/10.  (AR 428.)  Range of motion in her right thumb was close to full.  (AR 429.)  Plaintiff was prescribed meloxicam for pain.

(AR 430.)  PA Tremblay opined that Plaintiff was not to lift, carry, push or pull anything over 20 pounds, and should do no repetitive gripping/grasping. (AR 430.)

### 3.    Medical Treatment Providers – Left Knee

On August 1, 2014, Plaintiff presented to Yu-Lian Chang, M.D., for left knee joint pain.  (AR 853.)  X-rays were taken, and Plaintiff was given a knee brace. (AR 853.)

On September 2, 2014, Plaintiff presented to Ron Mac Nutt, P.A., for complaints of knee pain and follow-up of x-rays. (AR 848.)  Plaintiff stated she had been experiencing knee pain for approximately three months. (AR 849.)  She described her pain as 6-7/10 and feels like her knee is going to "pop out." (AR 849.) P.A. Mac Nutt noted that Plaintiff had been given a brace by her primary medical provider which she wore all the time. (AR 849.)  P.A. Mac Nutt reviewed the x-rays which showed no deformity or effusion, and assessed Plaintiff with left chondromalacia of patella. (AR 851.) Plaintiff was given an injection and advised to stop wearing the knee brace due to quad weakness. (AR 851.)

On December 16, 2014, x-rays were taken of Plaintiff's left knee in relation to Plaintiff's complaints of left knee pain. (AR 843-44.)  Findings revealed severe left patellofemoral mild to moderate left knee joint degenerative osteoarthritis. (AR 844.)  On September 14, 2016, x-rays were taken of both knees in response to Plaintiff's complaints of bilateral knee pain. (AR 911-12.)  As to the right knee, the findings were unremarkable. (AR 912.) The left knee, however, showed severe patellofemoral joint space narrowing and moderate tricompartmental marginal spurring. (AR 912.)

On March 31, 2015, Plaintiff presented to Gordon Lewis, M.D., concerning osteoarthritis of the left knee. (AR 842.)  Range motion was 0-120 degrees, there was no effusion or deformity, and collateral ligament stability was normal. (AR 842.)  Plaintiff had slight pain over the medial joint line and no pain over the lateral joint line. (AR 842.)  Dr. Lewis noted slight patellofemoral crepitus with active extension of the knee and severe tenderness with palpation of the retropatellar surface.  (AR 842.)  Dr. Lewis administered a cortisone injection and advised that a left total knee replacement may be necessary in the future. (AR 842.)

On April 18, 2016, Plaintiff had a telephone consultation with Rina Syliangco, M.D., for knee pain due to osteoarthritis. (AR 809.) Plaintiff rated her pain level at that time as a constant 10/10. (AR 809.) Dr. Syliangco referred Plaintiff for acupuncture treatment. (AR 809.)

On September 14, 2016, Plaintiff presented to Dr. Lewis. (AR 801.)  Dr. Lewis noted that Plaintiff had a patellar realignment procedure performed when she was 15 or 16 years old. (AR 801.) Plaintiff stated that the pain had gradually increased over the years, with more generalized pain in the left knee in the previous 2-3 years. (AR 801.)  Dr. Lewis noted that treatment had consisted of a few cortisone injections and NSAIDs. (AR 801.)  The pain had grown severe enough that walking and standing had been moderately limited. (AR 801.) Dr. Lewis recommended conservative treatment including NSAIDs and weight loss. (AR 803.)

Many examinations of the left knee, however, were unremarkable.  At examinations on February 13, 2014, April 16, 2015, October 7, 2015, December 14, 2017, March 14, 2018, May 4, 2018, June 12, 2018, September 10, 2018, no pain, tenderness, deformity or other issues with the left knee were noted, and Plaintiff had full range of motion. (AR 461, 466, 469, 476, 483, 504, 507, 814, 837, 856.)

## B.      Plaintiff's Hearing Testimony

Plaintiff stated she lived with her husband, who was employed, and two children. (AR 34-35.) She stated she worked at a school in food service for the past 15 years. (AR 35-36.)  Her duties included opening the school, taking milk from the refrigerator in cartons weighing 30 pounds, pushing the milk container into the cafeteria, setting up for the breakfast meals, and moving food items from the refrigerator to the counters. (AR 36.)  Plaintiff would then serve breakfast to the children. (AR 36.) She would also stack food trays, which were heavy, and later clean-up, which meant washing dishes, moving trays through the dish washer, and placing dishes on a rack. (AR 36-37.)  Plaintiff would repeat the process for lunch or brunch. (AR 37.)  Plaintiff stated she occasionally carried 40-pound frozen food items and stocked them in the refrigerator. (AR 37.)

The ALJ asked Plaintiff why she felt she was unable to work.  (AR 38.)  Plaintiff responded that her right hand hurt constantly. (AR 38-39.)  She stated her fingers would get stiff and become hard to move with usage. (AR 39-40.)  Plaintiff also stated her left shoulder and neck really bothered

her. (AR 39.)  Plaintiff stated she had surgery on her right hand and it had improved the condition. (AR 41.)  She stated the relief to her hand from the surgery was sustained, and although her hand still hurt, it did not hurt as much. (AR 52.)

Plaintiff stated her daily activities were affected by her right hand pain.  (AR 41.) She could not do a thorough house cleaning and could not drive for more than an hour. (AR 41.)  Plaintiff was able to do chores such as laundry, cooking, cleaning, and doing the dishes, but she needed her children to help her. (AR 45.)  She could do cooking chores such as chopping vegetables, but she would have her children help her with stirring or carrying things from the refrigerator.  (AR 46.)  She stated she could carry a maximum of ten pounds. (AR 46.)  She needed her husband or children to go grocery shopping with her so they could lift things for her. (AR 47.)  Plaintiff stated she would use the grocery cart to lean on to make her way through the store. (AR 47.)  She stated it took extra time to do things such as buttoning a shirt or pulling up a zipper. (AR 42.)  Plaintiff indicated she could only use a pen for a while before her hand bothered her and she would have to stop to give it a rest. (AR 42.)

The ALJ inquired as to what her medical providers advised her to do about her condition.  (AR 43.) Plaintiff stated the plan of treatment was to attend physical therapy, but Plaintiff stated she put it off because she wanted to see if home exercise could help. (AR 43.)  She stated the arm pain was constant and she wore a brace to ameliorate the pain. (AR 43.)  She also stated she was seeking acupuncture treatment for her neck pain. (AR 44.)  Plaintiff stated she loved acupuncture and didn't like to take a lot of pain medication. (AR 45.)  She also used diclofenac sodium cream to help with the pain. (AR 48.)

Plaintiff stated she had received cortisone shots for her knee pain, but they only provided temporary relief. (AR 49, 54.)  She indicated she wasn't interested in getting a knee replacement. (AR 49.)  Plaintiff wore a hand brace which she stated helped stabilize her wrist and manage her forearm pain. (AR 53.)

### C.      Vocational Expert

Luis O. Mas testified as a vocational expert ("VE"). (AR 56.)  Dr. Mas stated that Plaintiff worked as a food service worker, which was classified as medium work. (AR 56.)

In the first hypothetical, the ALJ posited an individual with the same age, education, and work experience as Plaintiff, with the following limitations: one who could lift 20 pounds occasionally and 10 pounds frequently; stand, walk and/or sit for 6 out of 8 hours each workday; occasionally traverse ramps or stairs, but no ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch or crawl; and frequently handle and finger with the dominant right upper extremity.  (AR 56-57.)  The ALJ asked if there were other jobs this individual could do. (AR 57.) The VE stated this individual could be employed as: 1) a mail sorter in private industry (DOT 209.687-026), classified as light work with 35,000 jobs in the nation; 2) a bench assembler (DOT 706.684-022), classified as light work with 45,000 jobs in the nation; or 3) a swatch clerk (DOT 222.587-050), classified as light work with 26,000 jobs in the nation. (AR 57.)

In the second hypothetical, the ALJ posited an individual with the same age, education, and work experience as Plaintiff, with the following limitations: one who could lift 10 pounds occasionally or frequently; stand, walk, and/or sit for 6 out of 8 hours each workday; occasionally traverse ramps or stairs but not ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch, or crawl; and occasionally handle and finger with the right upper dominant extremity. (AR 57.) The ALJ asked if such individual could perform the jobs identified in the first hypothetical, and the VE replied, "No." (AR 57.)  When asked if there were other available jobs in the economy, the VE stated, "No. There are no other jobs." (AR 58.)

D.      Lay Witness Statement

Plaintiff's daughter, Rachel Cantu, submitted a third-party function report with respect to Plaintiff's illnesses, injuries, and conditions that limit her daily activities. (AR 205.)  Ms. Cantu stated that Plaintiff was unable to walk comfortably due to hip and knee pain. (AR 205.)  She stated Plaintiff has difficulty grasping and holding things because of her hand injury. (AR 205.)  Ms. Cantu stated that Plaintiff does light house cleaning which is often interrupted by knee pain. (AR 206.) She stated that Plaintiff's family helps Plaintiff with cleaning, cooking and transporting her son to and from school and sports. (AR 206.)  Ms. Cantu stated that Plaintiff had difficulty dressing herself because she has trouble with pain while standing. (AR 206.)

Ms. Cantu stated that Plaintiff cooked meals such as scrambled eggs, sandwiches and frozen items approximately 3 times a week for 10-15 minutes at a time. (AR 207.)  She stated Plaintiff doesn't cook as much because it hurts to stand for more than one hour. (AR 207.)

Ms. Cantu stated that Plaintiff did light laundry and cleaned dishes. (AR 207.) She stated Plaintiff did not require assistance for this task, which takes approximately 15 minutes at a time. (AR 207.)

Ms. Cantu stated that Plaintiff would go outside daily, would drive or ride in a car, and was capable of going out alone. (AR 208.)  She would shop for groceries and household items in stores and by computer. (AR 208.) She could shop in store for about an hour but no longer because of the pain from walking. (AR 208.)

Ms. Cantu stated that Plaintiff could pay bills, count change, handle a savings account, and use a checkbook. (AR 208.)  She stated Plaintiff's hobbies included watching TV, reading, and hanging out with her family on a daily basis. (AR 209.)  Socially, Plaintiff would spend time with others by sitting and talking with them, and occasionally going shopping with them. (AR 209.)  Ms. Cantu stated Plaintiff did not need anyone to accompany her. (AR 209.)

Ms. Cantu indicated that Plaintiff had limitations in lifting, walking, stair climbing, squatting, kneeling, using her hands, and standing. (AR 210.)  She stated Plaintiff could lift up to 10 pounds, cannot squat or kneel, and could only stand or walk for a limited time before experiencing pain. (AR 210.)  She stated Plaintiff could walk about 20 minutes with a limp before needing a rest. (AR 210.)  Ms. Cantu stated Plaintiff required a cane and brace/splint to assist with her pain. (AR 211.)

E.      Administrative Proceedings

The Commissioner initially denied Plaintiff's application for DIB on December 12, 2018. (AR 75.)  Plaintiff's application was denied again on reconsideration on February 14, 2019. (AR 90.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  At a hearing held on February 25, 2020, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 31-62.)  On March 17, 2020, the ALJ determined that Plaintiff was not disabled prior to July 22, 2018, in that she could perform other work; however, the ALJ

12

1    determined that Plaintiff was disabled as of July 22, 2018, the date Plaintiff's age category changed.

2    (AR 24.)

3         F.    The ALJ's Decision

4         In a decision dated March 17, 2020, the ALJ found that Plaintiff was disabled as of July 22,

5    2018, when her age category changed, and based on her age, education, work experience, and residual

6    functional capacity, there were no jobs that could be performed.  (AR 24.)  The ALJ determined that

7    Plaintiff was not disabled, as defined by the Act, prior to July 22, 2018, because Plaintiff could

8    perform work other than her former job. (AR 24.)  The ALJ conducted the five-step disability analysis

9    set forth in 20 C.F.R. § 416.920. (AR 18-25.)  The ALJ determined that Plaintiff had not engaged in

10   substantial gainful activity since June 1, 2013, the alleged onset date (step one). (AR 64, 171.)  At step

11   two, the ALJ found Plaintiff's following impairments to be severe: "degenerative osteoarthritis of the

12   left knee and status post arthroscopy to remove triangular fibrocartilage complex ("TFCC") tear of the

13   right wrist."  (AR 18.)  Plaintiff did not have an impairment or combination of impairments that met or

14   medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the

15   Listings") (step three). (AR 18.)

16        The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.

17   See 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual

18   functional capacity. . . . We use this residual functional capacity assessment at both step four and step

19   five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

20        to perform light work as defined in 20 CFR 404.1567(b) except with the following
21        limitations: could lift 20 pounds occasionally and 10 pounds frequently; stand, walk,
          and/or sit for six out of eight hours each; only occasional ramps and stairs; no ladders,
          ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and
22        frequent handling and fingering with the dominant right upper extremity.

23   (AR 19.)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be

24   expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity,

25   persistence and limiting effects of these symptoms are not fully supported." (AR 20.)

26        At step 4, the ALJ determined that Plaintiff was capable of performing the requirements of

27   representative occupations such as Private Industry Mail Sorter (DOT 209.687-025), Bench Assembler

28   (DOT 706.684-022), and Swatch Clerk (DOT 222.578-050). (AR 23-24.)  Ultimately, the ALJ

1   concluded that Plaintiff was not disabled because Plaintiff was capable of making a successful

2   adjustment to other work that existed in significant numbers in the national economy" (step 5). (AR

3   24.)

4        Plaintiff subsequently sought review of the ALJ's decision before the Appeals Council, which

5   denied review on September 11, 2020. (AR 1-9.) Therefore, the ALJ's decision became the final

6   decision of the Commissioner. 20 C.F.R. § 416.1481.

7   **III.   LEGAL STANDARD**

8        **A.   Applicable Law**

9        An individual is considered "disabled" for purposes of disability benefits if he or she is unable

10  "to engage in any substantial gainful activity by reason of any medically determinable physical or

11  mental impairment which can be expected to result in death or which has lasted or can be expected to

12  last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). However, "[a]n

13  individual shall be determined to be under a disability only if h[er] physical or mental impairment or

14  impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot,

15  considering h[er] age, education, and work experience, engage in any other kind of substantial gainful

16  work which exists in the national economy." Id. at § 1382c(a)(3)(B).

17       "The Social Security Regulations set out a five-step sequential process for determining whether

18  a claimant is disabled within the meaning of the Social Security Act." Tackett v. Apfel, 180 F.3d 1094,

19  1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); see also 20 C.F.R. § 416.920. The Ninth Circuit

20  has provided the following description of the sequential evaluation analysis:

21       In step one, the ALJ determines whether a claimant is currently engaged in substantial
         gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two
22       and evaluates whether the claimant has a medically severe impairment or combination of
         impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and
23       considers whether the impairment or combination of impairments meets or equals a listed
         impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically
24       presumed disabled. If not, the ALJ proceeds to step four and assesses whether the
         claimant is capable of performing her past relevant work. If so, the claimant is not
25       disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the
         [RFC]...to perform any other substantial gainful activity in the national economy. If so,
26       the claimant is not disabled. If not, the claimant is disabled.

27  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); see also 20 C.F.R. § 416.920(a)(4) (providing

28  the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be

                                                 14

1   'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."

2   Tackett, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

3   "The claimant carries the initial burden of proving a disability in steps one through four of the

4   analysis." Burch, 400 F.3d at 679 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

5   "However, if a claimant establishes an inability to continue her past work, the burden shifts to the

6   Commissioner in step five to show that the claimant can perform other substantial gainful work." Id.

7   (citing Swenson, 876 F.2d at 687).

8         B.     Scope of Review

9   "This court may set aside the Commissioner's denial of [social security] benefits [only] when

10  the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as

11  a whole." Tackett, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant

12  evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v.

13  Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229

14  (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." Ryan v.

15  Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

16  "This is a highly deferential standard of review . . . ." Valentine v. Comm'r of Soc. Sec.

17  Admin., 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed

18  only if that decision is not supported by substantial evidence or it is based upon legal error." Tidwell v.

19  Apfel, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's conclusion

20  when the evidence is susceptible to more than one rational interpretation." Id.; see, e.g., Edlund v.

21  Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one

22  rational interpretation, the court may not substitute its judgment for that of the Commissioner."

23  (citations omitted)).

24  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of

25  the Commissioner.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

26  determine whether the Commissioner applied the proper legal standards and whether substantial

27  evidence exists in the record to support the Commissioner's findings.  See Lewis v. Astrue, 498 F.3d

28  909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by

1   isolating a specific quantum of supporting evidence.'" <u>Tackett</u>, 180 F.3d at 1098 (quoting <u>Sousa v.</u>

2   <u>Callahan</u>, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole,

3   weighing both evidence that supports and evidence that detracts from the [Commissioner's]

4   conclusion.'" <u>Id</u>. (quoting <u>Penny v. Sullivan</u>, 2 F.3d 953, 956 (9th Cir. 1993)).

5        Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

6   <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454

7   F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the

8   ALJ's error was inconsequential to the ultimate nondisability determination.'" <u>Tommasetti v. Astrue</u>,

9   533 F.3d 1035, 1038 (9th Cir. 2008) (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 885 (9th

10   Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking

11   the agency's determination." <u>Shinseki v. Sanders</u>, 556 U.S. 396, 409 (2009) (citations omitted).

12  **IV.**   **DISCUSSION**

13       A.    <u>ALJ's RFC Finding</u>

14        Plaintiff first claims that the ALJ's RFC finding was not supported by substantial evidence.

15   She claims the ALJ improperly rejected the medical opinion of Dr. Fieser.  She also contends that the

16   ALJ's RFC finding was inconsistent with the objective medical evidence regarding her knee

17   impairment.  Defendant contends that the ALJ properly considered the supportability and consistency

18   of Dr. Fieser's medical opinions, and properly set forth specific and legitimate reasons for finding his

19   opinions only partially persuasive.  Defendant further contends that the ALJ's RFC finding regarding

20   the left knee impairment was consistent with the imaging studies, clinical findings, routine and

21   conservative treatment and Plaintiff's daily activities.

22        On January 18, 2017, the Social Security Administration published comprehensive revisions

23   to its regulations regarding the evaluation of medical evidence. <u>See</u> 82 Fed. Reg. 5844. For

24   applications filed on or after March 27, 2017, an ALJ need "not defer or give any specific evidentiary

25   weight, including controlling weight, to any medical opinion(s) or prior administrative medical

26   finding(s) ("PAMF") [i.e., state-agency medical consultants], including those from [a claimant's]

27   medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ is to evaluate medical opinions and

28   PAMFs by considering their "persuasiveness." <u>Id</u>. In determining how "persuasive" the opinions of a

1    medical source or PAMF are, an ALJ must consider the following factors: supportability, consistency,

2    treatment relationship, specialization, and "other factors." 20 C.F.R. § 404.1520c(b), (c)(1)–(5).

3          The ALJ's duty to articulate a rationale for each factor varies. 20 C.F.R. § 404.1520c(a)–(b). In

4    all cases, the ALJ must at least "explain how [the ALJ] considered" the supportability and consistency

5    factors, as they are "the most important factors." 20 C.F.R. § 404.1520c(b)(2). For supportability, the

6    regulations state: "[t]he more relevant the objective medical evidence and supporting explanations

7    presented by a medical source are to support his or her medical opinion(s) or prior administrative

8    medical finding(s), the more persuasive [the opinion or PAMF] will be." 20 C.F.R. § 404.1520c(c)(1).

9    For consistency, the regulations state: "[t]he more consistent a medical opinion(s) or prior

10   administrative medical finding(s) is with the evidence from other medical sources and nonmedical

11   sources in the claim, the more persuasive [the opinion or PAMF] will be." 20 C.F.R. §

12   404.1520c(c)(2).

13         Prior to the new regulations, the Ninth Circuit held that "[t]o reject [the] uncontradicted

14   opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are

15   supported by substantial evidence." Ryan, 528 F.3d at 1198 (quoting Bayliss v. Barnhart, 427 F.3d

16   1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another

17   doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are

18   supported by substantial evidence." Id. (quoting Bayliss, 427 F.3d at 1216); see also Reddick v.

19   Chater, 157 F.3d 715, 725 (9th Cir. 1998); Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017).

20         Several district courts have continued to apply the "specific and legitimate" standards for

21   articulation, also noting that the Ninth Circuit has yet to weigh in on this issue. See Kathleen G. v.

22   Commissioner of Social Security, No. C20-461 RSM, 2020 WL 6581012, at *3 (W.D. Wash. Nov. 10,

23   2020) (noting that "the new regulations . . . do not clearly supersede the 'specific and legitimate'

24   standard"); cf. Thompson v. Comm'r of Soc. Sec., No. 2:20–CV–3–KJN, 2021 WL 1907488, at *3 n.3

25   (E.D. Cal. May 12, 2021) (noting "it is not yet clear how much the new regulations affect other Ninth

26   Circuit principles governing Social Security review," but concluding that, "[i]n the absence of binding

27   interpretation by the Ninth Circuit, the court joins other district courts in concluding that longstanding

28   general principles of judicial review—especially those rooted in the text of the Social Security Act—

still apply to cases filed on or after March 27, 2017.").  Because, as discussed below, the Court concludes that the ALJ gave at least one specific and legitimate reason supported by substantial evidence for the weight given to Dr. Fieser's opinion, taking into account the opinion's supportability and consistency, the Court does not reach the issue of whether the new regulations have changed the articulation standard. See Ceja v. Comm'r of Soc. Sec., No. 1:20-CV-01267-EPG, 2021 WL 4690742, at *2 (E.D. Cal. Oct. 7, 2021) (adopting same approach).

Plaintiff contends that the ALJ did not properly consider the Dr. Fieser's medical opinion that she was limited to: lifting no more than 10 pounds; no repetitive motions of the right hand, including grasping, fine manipulation, pushing, pulling, rotating the wrist or thumb; no overhead reaching; and no pushing or pulling.  Plaintiff contends the ALJ's conclusion that Plaintiff could perform frequent handling and fingering with the right upper extremity was inconsistent and unsupported by the evidence.  The Court disagrees.

First, the ALJ considered the medical opinions of Dr. Masters and Dr. Wong that Plaintiff could perform light work with occasional postural activities, except frequent balancing and no climbing of ladders or scaffolds, and with frequent handling and fingering with the right upper extremity. (AR 21.) The ALJ found the opinions persuasive by properly giving reasons as to their supportability and consistency with the record, as follows:

> I find the opinions of Drs. Masters and Wong persuasive. The opinions are supported by an explanation of the record and the evidence upon which they rely. In addition, the opinions are consistent with the evidence in the record as a whole. As discussed above, this includes evidence of imaging studies of the claimant's right wrist and left knee; clinical findings; the claimant's improvement following right wrist surgery; the claimant's routine and conservative treatment for her left knee; and the claimant's ability to carry her 25 pound grandchild, attend to her personal care independently, prepare simple meals, wash dishes, take her children to school and pick them up, do laundry, make the bed, go visit her daughter at her daughter's house, and shop in stores for about 45 minutes at a time. Furthermore, the opinions were based on independent reviews of the claimant's medical records; they include a detailed discussion of the evidence reviewed and/or relied upon; and they concern a subject matter within the state agency consultants' fields of medical expertise. Moreover, state agency consultants are experts in Social Security disability programs and the evaluation of medical issues in disability claims under the Act. For these reasons, I find the opinions of Drs. Masters and Wong persuasive.

(AR 21-22.)

18

The ALJ also thoroughly considered Dr. Fieser's medical opinions, but determined that his opinions concerning Plaintiff's limitations were only partially persuasive.  The ALJ found Dr. Fieser's opinions following Plaintiff's January 2015 surgery to be persuasive, but found his opinions on her limitations prior to the surgery to be unpersuasive.  First, the limitations were inconsistent with the opinions of Drs. Masters and Wong, set forth *supra*.  Second, the ALJ found Dr. Fieser's opinion unsupported and inconsistent with Plaintiff's reported activities of daily life, including her ability to attend to her personal care, prepare simple meals, wash dishes, take her children to school and pick them up, do laundry, make the bed, and shop in stores. (AR 22.)  This was a specific and legitimate reason to reject the opinion.  See Ford v. Saul, 950 F.3d 1141, 1155 (9th Cir. 2020) (conflicts between a "physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion").

Third, the ALJ noted that Dr. Fieser's opinion was rendered in connection to Plaintiff's workers' compensation claim and was focused on Plaintiff's ability to return to her *past* work. (AR 22.)  The ALJ further noted that "the opinions were intended as temporary assessments of or limitations on the claimant's activities in order to evaluate and treat the claimant in connection with her worker's compensation claim."  (AR 22.) These points were also specific and legitimate reasons to distinguish Dr. Fieser's opinion from that of Dr. Masters and Dr. Wong.

Finally, the ALJ determined that Dr. Fieser's opinions concerning Plaintiff's condition post-surgery were overall persuasive because they were "supported by his own clinical examinations that showed improved findings," and "consistent with the [Plaintiff's] subjectively reported improvement, her routine and conservative treatment following surgery, her ability to carry her 25 pound grandchild, and her decision to decline physical therapy and manage her symptoms instead with pain medication." (AR 22.)

B.     Symptomology Evidence

Plaintiff contends that the ALJ improperly rejected her symptomology testimony.  She alleges the ALJ conflated and parsed Plaintiff's account of how she performs her activities of daily life in concluding that Plaintiff can perform frequent handling and fingering with the dominant right upper extremity.  She further argues that the ALJ failed to provide clear and convincing reasons supported

by evidence in the record to find Plaintiff not credible.  Defendant counters that the ALJ properly

evaluated Plaintiff's testimony and provided clear reasons supported by substantial evidence for

discounting Plaintiff's testimony.

In evaluating the credibility of a claimant's testimony regarding her impairments, an ALJ must

engage in a two-step analysis.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ

must determine whether the claimant has presented objective medical evidence of an underlying

impairment that could reasonably be expected to produce the symptoms alleged.  Id.  The claimant is

not required to show that her impairment "could reasonably be expected to cause the severity of the

symptom she has alleged; she need only show that it could reasonably have caused some degree of the

symptom."  Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant

meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's

testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for

the rejection.  Id.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1)
> ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,
> prior inconsistent statements concerning the symptoms, and other testimony by the
> claimant that appears less than candid; (2) unexplained or inadequately explained
> failure to seek treatment or to follow a prescribed course of treatment; and (3) the
> claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the
> court may not engage in second-guessing.

Tommasetti, 533 F.3d at 1039 (citations and internal quotation marks omitted); see also Bray v.

Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may

consider include a claimant's work record and testimony from physicians and third parties concerning

the nature, severity, and effect of the symptoms of which she complains. Light v. Social Sec. Admin.,

119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

demanding required in Social Security cases.'" Garrison v. Colvin, 759 F.3d 995, 1015 (9th Cir. 2014)

(quoting Moore v. Comm'r of Social Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)).  General

findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not

credible and what evidence undermines the claimant's complaints.'" Burrell v. Colvin, 775 F.3d 1133,

1138 (9th Cir. 2014) (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 20.) Nevertheless, the ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported." (AR 20.)  Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding.  See Vasquez, 572 F.3d at 591.  The ALJ found Plaintiff's credibility was reduced by several factors: 1) "The [Plaintiff] has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; and 2) Evidence of "overall routine and conservative" course of treatment was "further inconsistent with the [Plaintiff's] alleged severity of the symptoms and limitations."  (AR 21.)

With respect to the ALJ's reasoning that the objective evidence of record did not support Plaintiff's allegations regarding the severity of symptoms, the ALJ found that the medical evidence established that Plaintiff's impairments caused limitations in functioning that did not preclude all substantial gainful activity. (AR 19-21.)  With respect to Plaintiff's right thumb and hand injury, the ALJ noted that surgery was largely successful: "pain was much decreased following this surgery"; examinations "generally showed overall improvement with eventually close to full range of motion of the right hand and thumb and otherwise overall unremarkable findings"; and Plaintiff "reported improvement with conservative treatment." (AR 20.)  As to Plaintiff's left knee osteoarthritis, the ALJ noted that Plaintiff's knee pain worsened in 2014 and an x-ray in December 2014 revealed "severe left patellofemoral mild to moderate left knee joint degenerative osteoarthritis." (AR 20.)  The ALJ further noted that a "subsequent x-ray in September 2016 revealed severe patellofemoral joint space narrowing and moderate tricompartmental marginal spurring." (AR 20.)  Yet, the ALJ further noted that "[e]xaminations of the left knee and neurologic functioning were overall unremarkable with the exception of occasional findings of tenderness, slightly decreased range of motion, and slight crepitus." (AR 20.)  The ALJ noted that Plaintiff was advised that a total left knee replacement would be necessary "in the future, when pain was sufficiently severe, or [she could] receive cortisone injections every three-to-four months to manage her symptoms." (AR 20.)  However, the ALJ noted

that Plaintiff had not pursued these options as of the date last insured, and was able to manage her symptoms with conservative treatment. (AR 20.)

Thus, the ALJ provided substantial support by setting forth notable medical findings that were inconsistent with Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms. The Court finds that the ALJ properly considered inconsistency with the objective medical evidence as a "clear and convincing" reason to discount Plaintiff's credibility. See Salas v. Colvin, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014).

The ALJ found Plaintiff's testimony less persuasive due to her daily activities, which were inconsistent with her claimed limitations. (AR 20-21.)  It is appropriate for an ALJ to consider a claimant's activities that undermine claims of severe limitations in making the credibility determination. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); see also Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (an ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities.).  It is well-established that a claimant need not "vegetate in a dark room" to be deemed eligible for benefits. Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987).  However, if a claimant can spend a substantial part of their day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disability. Fair, 885 F.2d at 603. "Even where [Plaintiff's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1113.

Plaintiff alleges a total inability to work due to hand pain and knee pain.  (AR 24.)  In evaluating Plaintiff's credibility, however, the ALJ cited activities that were inconsistent with Plaintiff's testimony about the severity of her symptoms and impairments. The ALJ observed that Plaintiff "endorsed the ability to attend to her personal care independently, prepare simple meals, wash dishes, take her children to school and pick them up, do laundry, make the bed, go visit her daughter at her daughter's house, and shop in stores for about 45 minutes at a time," and" being able to carry her 25-pound grandchild following her right wrist surgery." (AR 20-21.)  Thus, the ALJ properly

considered Plaintiff's activities compared to her claimed severe limitations as a "specific, clear and convincing reason" for Plaintiff's adverse credibility finding.  See 20 C.F.R. § 416.929(c)(3); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989); Morgan v. Apfel, 169 F.3d 595, 600 (9th Cir.1999) (claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work).

Next, the ALJ found Plaintiff's allegations of disabling right hand and left knee pain less persuasive because of her conservative treatment.  The ALJ noted that Plaintiff underwent surgery for her right hand, which weighed in Plaintiff's favor as to the genuineness of her symptoms, but this factor was offset by the fact the surgery proved generally successful in relieving her symptoms. (AR 21.)  Prior to surgery, treatment was on a conservative, outpatient basis in the form of injections and ongoing medication management by her primary care physician. (AR 376, 767.)  Post-surgery, Plaintiff reported her pain had significantly improved, and as a result, pain medications were discontinued.  (AR 658.)  Plaintiff remained off medication for much of the time. (AR 524, 535, 542, 545, 551, 556, 561, 566, 593, 603, 608.)  In fact, when Plaintiff's medical provider advised physical therapy, Plaintiff declined and wanted only medications. (AR 43, 1098, 1102.)

With respect to her left knee, Plaintiff's course of treatment was overall routine and conservative in nature. (AR 21.) Her symptoms were effectively managed with pain medications, cortisone injections, a knee brace, physical therapy exercises, and acupuncture. (AR 21, 801, 803, 842, 849, 851.)  Contrary to her allegations of severe debilitating pain, many exams were unremarkable with Plaintiff reporting full range of motion, and no report of pain, tenderness, or deformity. (AR 461, 466, 469, 476, 483, 504, 507, 814, 837, 856.)

In summary, the medical evidence of record, activities of daily life, and conservative course of treatment constituted substantial evidence in support of the ALJ's decision to find Plaintiff's symptomology evidence inconsistent with the presence of an incapacitating or debilitating condition.

### C.     Lay Opinion Testimony

Plaintiff contends the ALJ improperly rejected the lay witness testimony of Plaintiff's daughter, Rachel Cantu, by failing to provide specific and legitimate reasons for rejecting the limitations the witness described.

1  "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony

2  concerning a claimant's ability to work." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009)

3  (quoting <u>Stout v. Comm'r Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006)); <u>see also</u> 20 C.F.R.

4  § 416.913(a)(4). Friends and family members in a position to observe symptoms and activities are

5  competent to testify as to a claimant's condition. <u>See</u> <u>Diedrich v. Berryhill</u>, 874 F.3d 634, 640 (9th Cir.

6  2017).  In this case, the ALJ noted that Ms. Cantu completed a third party function report form that

7  "overall reiterated [Plaintiff's] above-discussed subjective statements concerning the severity of her

8  symptoms and limitations." (AR 20.)  Under the revised regulations, the ALJ is not required to

9  articulate how he considered Ms. Cantu's testimony.  <u>See</u> 20 C.F.R. § 404.1520c(d) ("We are not

10  required to articulate how we considered evidence from nonmedical sources using the requirements in

11  paragraphs (a)-(c) in this section").  Thus, the Court finds that the ALJ did not err.

12      The ALJ also properly evaluated Plaintiff's subjective complaints—which were consistent with

13  Ms. Cantu's testimony.  Because the ALJ determined that Ms. Cantu's statements were consistent with

14  Plaintiff's own complaints, the ALJ was not required to reiterate those same reasons as to Ms. Cantu's

15  testimony.  <u>Valentine v. Commissioner Social Sec. Admin.</u>, 574 F.3d 685, 694 (9th Cir. 2009)

16  (holding that because "the ALJ provided clear and convincing reasons for rejecting [the claimant's]

17  own subjective complaints, and because [the lay witness's] testimony was similar to such complaints,

18  it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony").

19  **V.      CONCLUSION AND ORDER**

20      After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the

21  record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore

22  AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo

23  Kijakazi, Acting Commissioner of Social Security, and against Plaintiff, PATRICIA MORENO.

24

25  IT IS SO ORDERED.

26  Dated:   __July 21, 2022__                    ___/s/ *Sheila K. Oberto*___

27                                              UNITED STATES MAGISTRATE JUDGE

28